UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MONROE FEDERAL SAVINGS AND | : | |
| LOAN ASSOCIATION, | : | Case No. 3:12-cv-52 |
| | : | |
| Plaintiff, | : | |
| | : | Judge Timothy S. Black |
| vs. | : | |
| | : | |
| NEA GALTIER PARKING, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING FIRST SOUTHERN NATIONAL BANK'S
MOTION FOR PRELIMINARY INJUNCTION (Doc. 23)**

This civil case is currently before the Court on Cross Defendant First Southern

National Bank's motion for a preliminary injunction (Doc. 23) and the parties' responsive

memoranda (Docs. 31, 35).

First Southern requests that the Court issue a preliminary injunction against

Monroe Federal Savings and Loan Association ("Monroe"), ordering Monroe to desist

from its refusal to foreclose on collateral securing a $4.3 million loan to Defendant NEA

Galtier Parking LLC ("NEA"). Specifically, First Southern requests a preliminary

injunction ordering Monroe: (1) to desist from its refusal to proceed with receivership and

foreclosure proceedings; and (2) proceed with the receivership and foreclosure in

accordance with the determination of First Southern, as and when First Southern may

make any determinations.

## I.    BACKGROUND FACTS

On March 3, 2008, Plaintiff Monroe made a commercial loan to Defendant NEA in the amount of $4,300,000.00 ("Loan").  (Doc. 31, Ex. A at ¶ 4).  The Loan is secured by an Open-End Mortgage encumbering a commercial parking garage located in Ramsey County, Minnesota ("Mortgage").  (*Id.* at ¶ 6).  The Loan was also personally guaranteed by three California residents, Steve Resnick, Edward Simmons, and Dale Stark (collectively the "Guarantors").  (*Id.* at ¶ 7).

On March 5, 2008, Monroe entered into a Participation Agreement with Silverton Bank, whereby Silverton purchased an undivided 95% interest in the Loan from Monroe ("Participation Agreement").  (*Id.* at ¶ 8).  Monroe was the Originating Bank under the Participation Agreement and Silverton was the Participating Bank.  (*See* Participation Agreement at ¶ 1).

The Participation Agreement created a relationship between the Originating Bank and the Participating Bank, and recognized that the Originating Bank maintained the only contractual relationship with NEA as the borrower.  Accordingly, under the Participation Agreement Monroe retained the servicing and administration obligations for the Loan. (*Id.* at ¶ 16(a)).  Monroe's obligations in that regard are governed by an explicit duty of care and limitation of liability:

> Originating Bank agrees to exercise the same degree of care in administering Participating Bank's Participation Interest in the Loan that Originating Bank customarily exercises in handling similar loans for its own account; however, Originating Bank shall be liable to Participating Bank only for losses due to Originating Bank's lack of commercially reasonable conduct[,] negligence or willful misconduct.

(*Id.* at ¶ 16(d)).

The recognition of the respective contractual relationships also extended to the enforcement of the Loan. Under the Participation Agreement, Monroe retained "all rights with respect to the enforcement, collection, and administration of the Loan and the security underlying the Loan[.]" (*Id.* at ¶ 16(c)).

In the event of a material default under the Loan, Monroe is obligated to inform the Participating Bank "promptly" after learning of the default. (*Id.* at ¶ 10). The Participation Agreement then provides for an attempt at collaboration to address the default at issue:

> Upon becoming actually aware of a default by Borrower(s) under any of the Loan Documents or with respect to the Collateral, or any event which, with the giving of notice or passage of time or both, would constitute a default thereunder, Originating Bank and Participating Bank shall mutually agree upon a course of action within ten business days. If within ten business days a mutually agreeable course of action can not be decided, then, so long as either (i) the Participation Interest, together with any other interests held by other participants in agreement with the course of action proposed by Participant, equals or exceeds a majority of the then outstanding principal balance of the Loan, or (ii) the Participating Bank holds any Participation Interest as a result of the Originating Bank's inability to purchase that retained portion of the Participation Interest due to regulatory lending limits considerations as provided in paragraph 13 above, the decision of the Participating Bank shall control.

(*Id.* at ¶ 16(e)).

The Participation Agreement requires the Participating Bank to fund its pro-rata share of the expenses created by its decisions.  In particular, the Participating Bank is required to "promptly remit" payment to Monroe for expenses associated with any action to be taken at the Participating Bank's direction in response to a default.  (*Id.* at 16(a)).

Monroe and Silverton operated under the Participation Agreement without incident until 2009.  On or about May 1, 2009, Silverton was closed and the Federal Deposit Insurance Corporation ("FDIC") was installed as the receiver for its assets.  The FDIC then sold Silverton's interest in the Participation Agreement to First Southern on or about November 30, 2009.

In approximately September 2011, Steve Resnick, NEA's managing member, called Tony Greene, Monroe's Director of Commercial Lending, to inform him that NEA had not been able to pay the property taxes on the parking garage since 2010.  (Greene Aff. at ¶ 10).  Resnick informed Greene that extensive state-mandated structural inspections of the garage (implemented after the I-35W bridge collapse in Minneapolis) revealed latent deficiencies that required repair.  As a result, NEA had to use the funds allocated for property taxes to make those repairs.  (*Id.* at ¶ 12).

Monroe then informed First Southern of the tax arrearage.  (*Id.* at ¶ 12).  First Southern immediately sent representatives to the site, and responded to Monroe with an extensive list of questions regarding not only the structural integrity and tax arrearage, but

-4-

also the ownership and operation of the garage itself.  (*Id.* at  ¶ 13).  First Southern also requested updated personal financial statements and tax returns for all of the Guarantors, as well as current financial statements and operating statements for NEA.  (*Id.* at ¶ 14).

For its part, Monroe began performing its due diligence into the arrearage.  It had its attorneys investigate the extent of the tax arrearage, and determined that the arrearage totaled $501,466.01 for tax years 2010 and 2011.  (*Id.* at  ¶ 15).

Monroe also requested from NEA written responses to First Southern's list of questions, and copies of all of the financial documents First Southern had requested.  (*Id.* at ¶ 116).  NEA provided the responses to Monroe, and Monroe forwarded them to First Southern.  (*Id.* at ¶ 17).  NEA and the Guarantors then provided the financial documents requested by First Southern, which Monroe also provided to First Southern.  (*Id.* at ¶ 18).

As its first demand for a specific response to the tax arrearage, First Southern demanded that Monroe issue a notice of default to NEA informing them of the right to accelerate the entire amount due under the Loan.  (*Id.* at ¶ 19).  Monroe did so, issuing NEA a formal notice of default on October 11, 2011.  (*Id.* at ¶ 20).

First Southern then instructed its attorney to send a default letter to Monroe.  In it, First Southern accused Monroe of failing to administer the Loan in a commercially reasonable manner, and blaming Monroe for the arrearage.  (*Id.* at ¶ 21).

First Southern also demanded that Monroe procure a formal agreement from NEA and the Guarantors prior to any negotiations with them to address the arrearage, and

provided a template they wanted to be used. (*Id.* at ¶ 22). Again, Monroe obliged and procured the agreement so that negotiations to resolve the issues could begin. (*Id.* at ¶ 23).

In a December 12, 2011 letter, First Southern again accused everyone of wrongdoing and instructed Monroe to demand that NEA relinquish possession of the parking garage immediately. If NEA refused, First Southern instructed Monroe to institute foreclosure and receivership proceedings. (Doc. 31 at Ex. G).

Monroe responded with its own position on its obligations and duties under the Participation Agreement. (Doc. 31, Ex. H). Specifically, Monroe suggested that the actions First Southern demanded were not required under the Participation Agreement. Monroe also maintained that taking possession fo the parking garage made no economic or commercial sense and that the decision should at least wait until an appraisal of the garage could be performed.

After extensive efforts to settle this matter, Monroe filed this action to ask the Court to decide the propriety of First Southern's demands under the Participation Agreement.

## II.   STANDARD OF REVIEW

Federal Rules of Civil Procedure 65(a) and (b) permit a party to seek injunctive relief when the party believes it will suffer immediate and irreparable injury, loss, or damage. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Texas v. Camenisch*, 451

U.S. 390, 395 (1981).  Plaintiff bears the heavy burden of demonstrating its entitlement to a preliminary injunction.  "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."  *Overstreet v. Lexington-Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002).

In determining whether to grant a preliminary injunction, this Court must weigh four factors: (1) whether the moving party has shown a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable harm if the injunction is not issued; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuing the injunction.  *Ne. Ohio Coal. For Homeless & Serv. Emp. Int'l Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1009 (6th Cir. 2006).  These four considerations are factors to be balanced, not prerequisites that must be met.  *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453, 459 (6th Cir. 1997).  "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F.3d 620, 625 (6th Cir. 2000).

### III.   ANALYSIS

#### A.   Likelihood of Success on the Merits

The first factor to consider is "whether the plaintiff has demonstrated a strong likelihood of success on the merits." *Certified Restoration Dry Cleaning Network v.*

*Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007).  While a party is not required to prove his entire case, to establish success on the merits, a plaintiff must show "more than a mere possibility of success."  *Id.*

The merits at issue involve a contractual claim – specifically, an alleged breach of the Participation Agreement.[1]  First Southern essentially argues that it is entitled to specific performance of the Participation Agreement.  Based on the express language of the Participation Agreement, First Southern has a clear contractual right to compel Monroe to pursue receivership and foreclosure and Monroe has the clear contractual obligation to do both.  (Participation Agreement at ¶ 16(e)).

However, paragraph 16(e), and First Southern's right to direct those proceedings, is subject to the equitable principles recognized by the Georgia Supreme Court.[2]  Monroe argues that First Southern has not fulfilled its own obligations under the Participation Agreement that would entitle it to specific enforcement.  Specifically, Monroe claims that First Southern undermined the purpose of paragraph 16(e), which is to determine a course of action to address the default at issue, when it demanded judicial foreclosure proceedings despite the fact that all principal and interest payments on the underlying Loan remain current.  The foreclosure demand would not even address the tax arrearage

---

[1]  The Participation Agreement is governed by Georgia law.  (Participation Agreement at ¶ 20).

[2]  In Georgia, specific performance of a contract is an equitable remedy, and the Georgia Supreme Court requires that in order to be entitled to receive equity, one must do equity.  *Kirk v. First Georgia Inv. Corp.*, 236 S.E.2d 254, 256 (1977).  Therefore, a party seeking specific performance must show substantial compliance with his obligations under the agreement in order to be entitled to a decree of specific performance.  *Id.*

default and without a parking garage to generate the revenue being used to maintain the principal and interest payments, it could no longer remain current on its loan.

Additionally, Monroe claims that First Southern's refusal to remit payment for the expenses incurred as a result of its demands is further evidence of its own breach of the Participation Agreement. Despite a clear obligation in the Participation Agreement to pay its proportionate share, First Southern has refused to compensate Monroe for more than $15,000.00 in fees and expenses incurred as a direct result of First Southern's demanded course of conduct. (Greene Aff. at ¶ 30).

This Court declines to address the substantive arguments at this time. Even if this Court were to find that First Southern was likely to prevail on the merits, First Southern would still fail in meeting its burden for a preliminary injunction, as the other factors do not weigh in its favor. A district court is not required to make specific findings concerning each of the four factors used in determining a motion for preliminary injunction if fewer factors are determinative of the issue. *Moore v. Warden, Pickaway Cnty. Corr. Inst.*, No. 2:11cv132, 2011 U.S. Dist. LEXIS 106539, at *14 (S.D. Ohio Sept. 20, 2011) (declining to address final two injunctive relief factors when plaintiff had failed to demonstrate likelihood of success on the merits or irreparable harm), *aff'd and adopted*, 2011 U.S. Dist. LEXIS 134157 (S.D. Ohio Nov. 21, 2011).

### B. Irreparable Harm

A court must consider whether the plaintiff will suffer irreparable injury without the injunction. *Certified Restoration Dry Cleaning Network*, 511 F.3d at 550. First Southern must show that without injunctive relief, it will suffer actual and imminent harm

rather than speculative or unsubstantiated harm. *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). Harm is considered "irreparable" only to the extent it is not fully compensable by monetary damages. *Downing v. Life Time Fitness*, No. 11-1092, 2012 U.S. App. LEXIS 10000, at *20 (6th Cir. May 15, 2012).

First Southern claims that: (1) the irreparable harm is the loss of the prematurity default remedy; (2) the increasing tax liability threatens NEA Galtier's ownership of and the lender's right to access the collateral for recovery of the debt; and (3) the garage is in disrepair and thus losing value.[3]

<u>First</u>, this Court fails to see how the prematurity default remedy is different from the loan repayment amount. Without the prematurity default remedy, First Southern will not be able to collect on the loan as quickly. However, this harm is monetarily compensable through repayment of the loan, costs, fees, interest, etc. (Doc. 25 at 19). The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Babler v. Futhey*, 618 F.3d 514, 523-24 (6th Cir. 2010).

---

[3] None of the cases cited by First Southern demonstrate that it will suffer irreparable harm "as a matter of law." (Doc. 23 at 16-17). All of the cases are factually distinguishable. *See, e.g., City Nat'l Bank v. WBP Invs.*, No. 10AP-1134, 2011 Ohio App. LEXIS 5015 (Ohio Ct. App. Nov. 29, 2011) (involved the appointment of a receiver not a preliminary injunction); *First Tenn Bank Nat'l Ass'n v. Pac. Am. Group, Inc.*, No. 07-2664, 2007 U.S. Dist. LEXIS 99839, at *4-5 (W.D. Tenn. Nov. 20, 2007) (involved a borrower's threatened disposition of collateral on a loan that had matured); *Livonia Prop. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings*, 399 Fed. Appx. 97, 100 (6th Cir. 2010) (denying a motion for preliminary injunction by a borrower seeking to enjoin a foreclosure action under Michigan law); *Almetals, Inc. v. Wickeder Westfalenstahl*, No. 08-10109, 2008 U.S. Dist. LEXIS 87403, at *21 (E.D. Mich. Oct. 29, 2008) (an injunction was warranted because damages from the supply interruption would be "incalculable and irremediable.").

-10-

It is clear that First Southern has the greatest financial stake in the parking garage and therefore has the most to lose – but the Court has yet to see how First Southern's financial interest is being harmed while the garage continues to operate and the borrowers continue to upkeep the garage and make payments on the loan and repayments toward their tax arrearage. If this Court had evidence that the garage was in disrepair, or that the city of St. Paul was on the verge of a tax foreclosure, this Court's opinion would be quite different, but those are not the facts before the Court today.

Second, there is no imminent risk of NEA losing ownership of the parking garage in a tax foreclosure. A tax foreclosure can only occur under Minnesota law upon the expiration of a three year forfeiture period commencing with the date of the initial tax delinquency notice. (Doc. 23 at 18, Ex. 3). In this case, the earliest that a tax foreclosure could occur would be in the fall of 2014. (Resnick Dec. at ¶ 4). Additionally, the real property taxes are in fact being paid. Specifically, the tax assessment for the 2012 calendar year is payable in two semi-annual installments over the course of the year and the first installment was due and paid in full on May 15, 2012. (Resnick Dec. at ¶ 2, Ex. A-1). NEA has also been making regular monthly payments towards the tax liability for the 2010 and 2011 tax years and is pursuing options to allow it to bring the entire tax arrearage current. (*Id.* at ¶ 3). Accordingly, there is no urgency or threat of irreparable harm.

Third, in addition to performing routine upkeep and maintenance, NEA is also in compliance with an Operation and Maintenance ("O&M") plan that was mandated by the

city of St. Paul. (*Id*. at ¶ 7-8). In performing the work required by the O&M plan, NEA discovered a sub-surface condition involving numerous broken post-tension cables that required repair. (*Id*. at ¶ 8). However, NEA took appropriate action and all of the post-tension cables have since been repaired. (*Id.*)

Finally, it is important to note that First Southern waited four months after the removal of this case to file the motion for preliminary injunction. *See, e.g., H.D. Vest, Inc., v. H.D. Vest Mgmt. & Servs., LLC*, No. 3:09cv390, 2009 U.S. Dist. LEXIS 52950, at *4 (N.D. Tex. June 23, 2009) (five-month delay in moving for preliminary injunction "is sufficient to rebut a presumption of irreparable harm."). This significant delay in seeking relief further supports a finding that First Southern is not suffering irreparable harm.

In sum, First Southern has not yet suffered any injury, and any future injury can be repaid by a definite sum of money. Accordingly, First Southern has failed to "demonstrate, by clear and convincing evidence, actual irreparable harm or the existence of an actual threat of such injury." *Patio Enclosures v. Hebst, Inc*., 39 Fed. Appx. 964, 969 (6th Cir. 2002).[4]

## C.  Whether the Issuance of an Injunction Would Cause Substantial Harm to Others and/or Serve the Public Interest

The final factor in the injunctive relief analysis is harm to others. The Sixth Circuit has stated that "[t]he irreparable injury [the plaintiffs] will suffer if their motion

---

[4]  Moreover, First Southern has a motion for judgment on the pleadings pending before the Court. (Doc. 29). The motion will be ripe in less than a month (July 25, 2011). If the facts of this case are as clear as First Southern maintains, a decision on the merits is forthcoming.

for injunctive relief is denied must be balanced against any harm which will be suffered by [others] as a result of the granting of injunctive relief." *Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982).

First Southern claims that Monroe will not suffer because it will benefit from collection as owner of five percent of the loan. However, that assumes the parking garage will sell at a foreclosure sale for enough to satisfy all costs, expenses, and outstanding debt on the loan. Without an appraisal on the garage, and with the uncertainty of such a sale, First Southern is in no position to make such an assumption.

Generally, the public interest weighs heavily against unnecessary foreclosure actions. *Sayo Inc. v. Zions First Nat'l Bank*, No. 06-14963, 2006 U.S. Dist. LEXIS 85162, at *17 (E.D. Mich. Nov. 22, 2006). In the instant case, the judicial foreclosure and receivership of the parking garage would cause obvious harm to Monroe, as it would be in the line-of-fire for lender liability claims. Additionally, as an income-producing asset, the parking garage is the reason that NEA has been able to make the payments on principal and interest to date and make payments towards the tax arrearage. Foreclosure and receivership would both jeopardize the health of the Loan and disrupt the status quo.

Balancing the four factors to be considered when determining whether to grant a motion for a preliminary injunction, this Court finds that First Southern has failed to carry the heavy burden of demonstrating its entitlement to the extraordinary remedy.

-13-

## IV.   CONCLUSION

Accordingly, for the reasons stated herein First Southern's motion for a preliminary injunction (Doc. 23) is **DENIED**.

**IT IS SO ORDERED**.

Date:  July 11, 2012                          *s/ Timothy S. Black*
                                             Timothy S. Black
                                             United States District Judge

-14-